677 So.2d 918 (1996)
Peter K. VACCARO, Appellant,
v.
Janet D. VACCARO, Appellee.
No. 95-1223.
District Court of Appeal of Florida, Fifth District.
July 12, 1996.
*920 Charles D. Jamieson of Glickman, Witters & Marell, West Palm Beach, for Appellant.
Frank D. Upchurch, III, and Katherine G. Jones of Upchurch, Bailey & Upchurch, P.A., St. Augustine, for Appellee.
PETERSON, Chief Judge.
Peter K. Vaccaro appeals the final judgment of dissolution of his marriage to Janet D. Vaccaro. He alleges that the trial court committed reversible error in its failure to: 1) account for all the parties' marital assets in its equitable distribution; 2) award him a one-half interest in Janet's retirement plan which had accrued during the marriage; 3) properly value the stock of a corporation which provided a major source of income to the former couple; 4) recognize the effect of income tax laws in calculating the value of the stock; 5) recognize the prejudicial effect of Janet's failure to file an updated financial affidavit; and 6) make the findings required to impute income against him.

I
Peter correctly complains that the judgment ordering equitable distribution of the marital assets fails to mention items of personal property owned by the parties that are in Janet's exclusive possession. These items include an automobile, furniture and furnishings, jewelry, tools and other items that the husband values at $57,500. While both the ownership and value of the assets may be in dispute, it is indisputable that written findings of fact identifying marital and non-marital assets are required by section 61.075(3), Florida Statutes (1995). Additionally, Peter complains that the final judgment does not consider certain debts which he claims were acquired during the marriage and for which he has paid or is responsible. The debts or amounts he alleges he paid include a loan of $25,000 from Peter's mother, Visa cards in the amounts of $2,787 and $6,000, a Sears credit card in the amount of $6,035 and a Discover card in the amount of $815. On remand, the trial court shall consider these items of assets and liabilities, determine whether they should properly be considered in making an equitable distribution, and if so, make the appropriate allocations. § 61.075(3)(c), Fla. Stat. (1995).

II
Paragraph 10 of the amended final judgment states:
The Former Husband seeks a portion of the Former Wife's pension (retirement) which accrued during the course of the marriage . ... However, the Former Wife's pension was not vested at the time of the Parties' separation and therefore had no value.
(Emphasis added.)
Marital assets subject to equitable distribution include all "vested and non-vested benefits, rights, and funds accrued during the marriage in retirement, pension ... plans and programs." §§ 61.075(5)(a)4, 61.076(1), Fla. Stat.; Diffenderfer v. Diffenderfer, 491 So.2d 265 (Fla.1986); Carroll v. Carroll, 528 So.2d 931 (Fla. 3d DCA 1988); DeLoach v. DeLoach, 590 So.2d 956 (Fla. 1st DCA 1991). The final judgment is in error in failing to consider the pension, notwithstanding that it has not yet vested. We refer the trial court to the opinion in DeLoach for a detailed analysis of the methods of equitably distributing non-vested plans. It would appear to us that the deferred division of benefits on a fixed percentage basis would be an equitable manner of distribution in the instant case and should be considered upon remand.

*921 III
The final judgment values the capital stock of Buffalo Customhouse Brokerage Company, Inc. (Buffalo), at $926,980. Buffalo is a brokerage company located in Buffalo, New York, that was started by Peter in 1981. It facilitates the import and export of freight across international borders. At the time of the dissolution, Peter and Janet owned 80% interest of the stock in this corporation, having given 20% of the stock to long-term employees as an incentive. The company is still quite active and owns several parcels of real estate.
Peter's expert appraiser from a professional consulting and appraisal firm used recognized methods of appraisal and considered the value of Buffalo arising from both the operations and its ownership of four parcels of real estate. The appraiser physically inspected each parcel of real estate, investigated the market trends and competition for the type of service performed by Buffalo, talked with employees of the company, obtained and analyzed financial information and prepared a twenty-two page comprehensive report in which the value appraiser stated his opinion that the indicated, on-going, business value of the company is $326,000. Additionally, his explanation of the manner in which he conducted the appraisal was supplemented to the record through a transcript of his deposition.
Janet's valuation reports were admitted into evidence over objection because of confusion over some pre-trial stipulations. The trial court admitted them upon the condition that the expert witnesses be deposed after trial and Peter be given the opportunity to respond. The experts later gave depositions but transcripts of these depositions do not reflect that they can be relied upon as a basis for a valuation of Buffalo. A review of the deposition of a business broker indicates that she based her valuation on the financial statements included in Peter's appraisal, that she talked with no one that conducted the business of Buffalo; that she did not inspect any of the real estate or corporate facilities; and that she saw no other documents except those included in the appraisal report secured by Peter. It is only fair to note this expert witness appears to have complied with the specific request made to her: to review Peter's appraisal rather than to arrive at an independent appraisal. She was asked whether the document that Janet introduced at trial as an appraisal was anything more than a letter with comments or questions that Janet's attorney could use to critique Peter's appraisal. Her response was "(b)asically, it's just a letter with comments." She later indicated that her letter was her opinion of whether Peter's appraisal was accurate and if not, why not. She admitted that she had never performed an appraisal of a custom brokerage business, knew nothing about the business and had never conducted an appraisal in western New York. Finally, she indicated that she was not a real estate appraiser.
Janet's second expert was a Florida certified public accountant who had performed about 24 business valuations within the six year period before he was deposed. He had never performed an evaluation in western New York. He stated that he was semi-familiar with custom brokerage houses because his father was in the marine transportation business, but that had been 18 years previous to the deposition. We conclude from his deposition that he was also retained to evaluate Peter's appraisal rather than to independently evaluate Buffalo and arrive at a conclusion as to its value.
The trial court should not have considered the two reports submitted by Janet as a valuation of Buffalo. The depositions of both of the persons preparing the reports plainly indicate that they did not consider them as appraisals, but as an evaluation of Peter's report. We must remand on this issue and instruct the court to value the entire outstanding stock of Buffalo in accordance with Peter's appraisal of $326,000. Peter's appraisal is the only expert opinion supported by competent substantial evidence. See Spillert v. Spillert, 564 So.2d 1146 (Fla. 1st DCA 1990).

IV
Peter complains that the trial judge failed to take into consideration the consequences of income tax laws on the distribution *922 of marital assets. The record does not reflect that the parties offered any evidence as to the tax consequences on the distribution. Peter did introduce a one-page computation by his accountant that indicated what the double effect of federal and state income tax would be to both Buffalo and himself if Buffalo sold its assets and distribution was made to Buffalo's stockholders. But there was no testimony by Peter or any other witness about the purpose of the computation, what the prospects were for such a disposition as distinguished from an outright sale of the stock, or whether any such sale was contemplated.
The mere introduction of a schedule, showing the worst case scenario for a disposition of the marital asset is not what has been contemplated when trial courts have instructed parties to consider tax consequences. It does not mean that the trial court must allow an automatic reduction of value as Peter implies in his argument.
The purpose of considering tax consequences is to strive for a fair and equitable distribution of marital assets to both parties. One party should not be charged with the full value of an asset that is burdened with an inevitable payment of taxes. The effect of the burden should be considered so that neither of the parties gains an unfair advantage or suffers an unfair burden because he or she receives a particular asset in distribution.[1]
A party who demands consideration of the tax consequences of receiving a tax burdened asset should demonstrate good faith by assisting the trial court in consideration of the tax consequences of all the tax-burdened marital assets, whether or not the demanding party is to receive those particular assets. It is only through the presentations of the consequences as to all assets that the trial court may order a distribution that is equitable. Selection of only one asset to demonstrate a worst case tax consequence when others are also burdened may require that the trial court ignore the tax consequences as to all distributable assets.
We reject the husband's complaint in this case that the value of the stock awarded to him must be reduced to reflect speculative or possible future tax consequences.

V
Peter also asserts that the final judgment was reversibly flawed by the trial court's failure to recognize the prejudicial effect of Janet having failed to file an updated financial affidavit. Each party seeking (1) child support, alimony, or modification thereof; (2) equitable distribution of assets or debts; or (3) attorneys' fees, suit money, or court costs, must serve on all parties a financial affidavit in substantial conformity with Rule 1.611(a), Florida Rules of Civil Procedure.
A judgment that grants monetary relief may be vacated on appeal if the party awarded relief failed to file a required financial affidavit. However, the judgment may be vacated on this basis only if the appellant objected at trial to the other party's failure to file an affidavit. See Seinfeld v. Seinfeld, 363 So.2d 19 (Fla. 3d DCA 1978). The appellant must demonstrate that he was prejudiced by the other party's failure to file the affidavit and that the award is not supported by competent substantial evidence. Seinfeld v. Seinfeld, supra; Nour v. Nour, 373 So.2d 379 (Fla. 1st DCA 1979). To establish prejudice, the appellant must demonstrate that the court would not have awarded the monetary relief had it possessed the information required by the financial affidavit. Seinfeld v. Seinfeld, supra.
Assuming Peter properly objected at trial, Peter was not prejudiced by Janet's failure to file the affidavit since Peter, himself, supplied competent substantial evidence of her income. Janet testified that, as of 1991, there was only one increase in her compensation. Peter's exhibit from the State of Florida indicates that Janet's net *923 monthly income as of 1992 was $1,652.26; the trial court rounded off that amount to $1,700 for its child support determination. Since there was competent substantial evidence of Janet's salary and her additional rental income which the court considered, the failure to file an updated financial affidavit was harmless.
Peter's reply brief states that he was prejudiced in that Janet made "no indication of any `in-kind' contributions from the State of Florida in terms of payment of health insurance, life insurance, or contribution to her retirement account, which she received as part of her income package." Peter is referring to section 61.30(2)(a)13, Florida Statutes, which instructs the court to consider "[r]eimbursed expenses or in kind payments to the extent that they reduce living expenses" in determining the parties' income levels under the child support guidelines. Peter cites Garcia v. Garcia, 560 So.2d 403 (Fla.3d DCA 1990), in which the appellant's housing, motor vehicle, credit card expenses, and other expenses were being paid for by either the family business or his father. The appellee/wife and child were also provided free housing by the father. The Third District reversed, directing the court specifically to section 61.30(2)(a)13, since it was obvious that their living expenses had been reduced by payments from either the business or the father. The ordinary employment deductions itemized on Janet's pay stub are hardly comparable to the unusual employee payments influenced by the family relationship in Garcia. The employment benefits enjoyed by Janet has not in any way "reduced living expenses" for Janet.

VI
Finally, Peter complains that the trial court imputed income to him for the purpose of establishing his obligation for child support but failed to indicate the source of the income. The trial court made the following findings:
... The Court is not convinced that the Former Husband does not have the ability to earn a salary. The evidence is clear that the Former Husband, as the majority stockholder of Buffalo Custom House Brokerage, is able to and has in fact, set his own salary.... The Court finds that the Former Husband's net income for child support guideline purposes is $5255.00 per month, plus $89.00 of disability income for a total net income of $5344.00. The Former Wife's net income from her employment is $1700.00 per month together with $400.00 per month net rental income, for a total monthly net of $2100.00 per month.
There are three minor children and the guideline support for those children is $2423 per month. The Former Husband's share is $1720.00 per month in child support.
The standard of review for the trial court's findings is whether there is competent substantial evidence to support these findings. Wander v. Wander, 485 So.2d 896 (Fla. 4th DCA 1986). Our review of the record indicates the presence of the requisite evidence.
The trial court had the following facts before it when determining Peter's net income for child support guideline purposes:
1) Buffalo's corporate income tax returns for the years 1989-91.
2) The parties' 1991 joint income tax return which indicated Peter's wage was $84,401.
3) Peter's 1992 income tax return which indicated his wage was $83,145.
4) A 1993 Dunn & Bradstreet report which was based on information furnished by Buffalo; this report evaluated the years of 1991-93.
5) Financial statements for the years of 1993-94 provided by Buffalo's accountants;.
6) Peter's 1994 W-2 form which indicated his wage was $60,847.30.
These various financial documents support the trial court's finding. Furthermore, appellant's reasons for reducing his salary, i.e., due to business downturn, mental incapacity because of depression attributable to his service in Vietnam, and increased salaries for officers due to their increased responsibility, were suspect. The trial court was free to reject these reasons since appellant's own testimony discredited them. Specifically, Peter *924 testified that his salary reduction was "based on business reasons," not his alleged mental incapacity that he pleaded for the first time in his second motion for modification dated February 10, 1994. Similarly, Peter, when questioned by his own attorney as to whether he had given raises to the other officers to compensate them for stepping forward and performing additional duties during his bout with depression, answered, "Maybe to a small degree." The trial court should be given deference in weighing this testimony against the other undisputed facts in this case.
The trial court's determination of total net income for both Peter and Janet is supported by the evidence and affirmed. The amount ascertained by the trial court as Peter's income was both stated and within the parameters of the historical payments made to him by Buffalo.

CONCLUSION
We remand:
1) For the clear identification of marital and non-marital assets and liabilities, the value to be given to each, and the designation of the spouse entitled to each asset or responsible for each liability as required by section 61.075(3), Florida Statutes (1995).
2) To assess the value of Janet's retirement plan.
3) To adjust valuation of the entire outstanding stock of Buffalo in accordance with Peter's appraisal of $326,000.
4) To make all necessary adjustments to achieve an equitable distribution of the marital assets, including a re-examination of the question of alimony in light of applicable statutory requisites and the above revisions to the final judgment. See Noah v. Noah, 491 So.2d 1124, 1128 (Fla.1986) ("trial court should be given an opportunity on remand to reconsider the entire distribution scheme including the award of periodic and permanent alimony").
We affirm the dissolution of the marriage as well as the trial court's determination of the parties' obligations for child support.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
COBB and THOMPSON, JJ., concur.
NOTES
[1] It is impossible to establish a bright line rule. Perhaps the fairest and easiest method of achieving equality in the distribution of close corporation stock would be to distribute the stock to each of the parties. But because the parties have usually already demonstrated a lack of harmony in their personal relations, it is difficult to envision that they would have harmony in such a business relationship.